**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXTREME PLASTICS PLUS, INC., et al.,[1] | ) | Case No. 16-10221 (CSS) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

**DECLARATION OF RYAN BOULEY IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Ryan Bouley, being duly sworn, deposes and says:

1.      On January 31, 2016 (the "Petition Date"), Extreme Plastics Plus, Inc., a Delaware corporation ("Extreme Plastics") and its related debtors (collectively, the "Debtors") each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court").  I am the Chief Restructuring Officer ("CRO") of the Debtors and was retained as of November 30, 2015.  In accordance with my engagement as CRO, I have become thoroughly familiar with the day-to-day operations and the business and financial affairs of the Debtors.

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

3.      I submit this Declaration (the "Declaration") to assist the Court and the other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first day motions and applications filed in these cases (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Extreme Plastics Plus, Inc. (6913) and EPP Intermediate Holdings, Inc. (6129). The location of the Debtors' corporate headquarters and service address is: 360 Epic Circle Dr., Fairmont, WV 26554.

"First Day Motions").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

4.      This Declaration is divided into two sections.  Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the liquidity events giving rise to these cases.  Section II sets forth those facts that are most germane to this Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

## BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.      Corporate Structure

5.      Extreme Plastics is a privately held Delaware corporation and the primary operating company for the Debtors' business.

6.      The stock of Extreme Plastics is held entirely by EPP Intermediate Holdings, Inc. ("EPP Intermediate"), a Delaware corporation, which is also a Debtor herein.

7.      The stock of EPP Intermediate is held entirely by EPP Holding Company, LLC, a Delaware limited liability company, which is not a Debtor herein.

B.      **Overview of Business Operations.**

1.      **Overview**

8.      Two other operating companies which operate the Debtors' businesses, Three Amigos Rentals, LLC ("3A") and American Well Service, LLC ("AWS") merged into Extreme Plastics on January 1, 2016.

9.      Founded in 2007, Extreme Plastics operates an environmental containment business specializing in providing environmental lining, above ground storage tanks, composite rig mats, secondary steel wall containment systems, and closed loop solids control services, primarily for the oil and gas industry.

10.     The Debtors' business has three main components, primarily directed to customers in the oil and gas industry.  First, the Debtors sell and install environmental lining used for environmental containment.  Second, the Debtors rent and install above-ground storage tanks and composite rig mats.  Third, the Debtors provide "closed loop" solids control services for customers.

11.     The Debtors historically conducted their business through three operating Debtors, Extreme Plastics, 3A, and Extreme Plastics.  These entities were consolidated by merger into Extreme Plastics effective January 1, 2016.  Following the merger, these operations are constructed jointly.

12.     Extreme Plastics acquired the stock of AWS in September 2014.  At the time of acquisition, AWS specialized in containment and closed loop solids control to oil and gas exploration and production companies throughout the Marcellus and Utica Shale plays and also provided light equipment and workers to support centrifuge operations that are involved with reclaiming and recycling drilling fluid (also known as drilling mud).

13.     Extreme Plastics acquired the stock of 3A in July 2014.    At the time of acquisition, 3A's primary business consisted of installing water containment systems for drilling and fracking activities in the Permian Basin.

14.     The Debtors operate six facilities in Fairmont, West Virginia, Tunkhannock, Pennsylvania, St. Clairsville, Ohio, Moore, Texas, Odessa, Texas, and Oklahoma City, Oklahoma.

### C.     Prepetition Capital Structure

15.     Extreme Plastics is a party to that certain Amended and Restated Credit Agreement with Citizens Bank of Pennsylvania, as Administrative Agent (the "Agent"), Citizens Bank, National Association, as Sole Lead Arranger and Sole Bookrunner, First National Bank Of Pennsylvania, as Syndication Agent, and the Other Lenders Party Hereto (the "Secured Lenders") dated as of September 3, 2014 (as amended from time to time, the "Secured Facility"). Pursuant to a Guarantee and Collateral Agreement dated as of September 3, 2014, the other Debtors, EPP Intermediate, 3A, and AWS are all Guarantors under the Secured Facility.

16.     The principal amount borrowed under the Secured Facility was $52,830,511.63. The maturity date was September 3, 2019.  Interest accrues under the Secured Facility at variable rates ranging from LIBOR plus 2.5% to Prime plus 4.5%.  As discussed in more detail below, the Agent asserted that default interest has accrued since October 1, 2015 at the rate of $8.75% for all obligations under the Secured Facility.

17.     The Secured Facility is secured by a lien on substantially all of the Debtors' assets, as well as a pledge of 100% of the equity in Extreme Plastics and EPP Intermediate.

18.     As of the Petition Date, and assuming no accrued postpetition interest, the Debtors' outstanding obligations relating to the Secured Facility total not less than

$49,480,677.88, comprised of outstanding principal of $49,146,432.70, accrued but unpaid interest of approximately $334,246.18 (including interest at the default rate accruing since October 1, 2015), and unpaid fees, costs, and expenses thereunder in an unliquidated amount.

19.    The Debtors defaulted under the Secured Facility because they exceeded the maximum permissible loan-to-coverage ratio of 2.75:1.00 as of September 30, 2015 and also missed the fixed charge coverage ratio of 1.25:1.  The Debtors endeavored to negotiate in good faith with the Agent regarding a forbearance agreement or waiver of this default, but have been unable to reach terms with the Agent on any forbearance or waiver.  The Agent declared default as of October 1, 2015 and the Agent takes the position that such default continues and has not been cured.

20.    EPP also is a Debtor on two promissory notes to insiders.  One note has a remaining balance of $7,500,000.00 owed to BW4 Investments Group, Inc.   The note was originally issued in the amount of $10,000,000.00 with a ten percent interest rate from inception on December 6, 2013, through December 31, 2014.  Beginning in January 1, 2015, the interest rate increases by 2.0 points per year to a maximum of 18 percent.  The principal amount of the note was reduced by $2,500,000.00 in June 2014 when the noteholder was paid $1,560,000.00 in cash and $940,000.00 was allocated from debt to equity in connection with the acquisition of 3A.

21.    EPP also owes a note with the remaining balance of $2,000,000.00 to the sellers of AWS.  This amount was initially an earn-out payable to the Sellers of AWS if 2014 gross revenue from the AWS operation exceeded $23,500,000.  Originally, this amount, if earned, was due and payable 10 days after the delivery of audited financial statements for 2014.  The amount was earned, but in August 2015 the parties to the original AWS purchase agreement amended the terms of that agreement redefining the earn-out as deferred compensation under the agreement

and modified the terms of payment.  Under the new terms, the $2,000,000 became a note earning 8% per annum on the unpaid portion beginning July 1, 2015 and will be payable in 12 equal quarterly installments beginning June 30, 2016.

### D.   Events Leading To A Chapter 11 Filing

22.    Because the Debtors' customers are primarily oil and gas exploration and production companies, demand for the Debtors' services is largely driven by its exploration and production customers' capital spending, which can experience significant fluctuation depending on commodity prices and expectations of future price levels, among other factors.  The recent and on-going decline in the price of crude oil and natural gas has negatively impacted demand for the Debtors' services.

23.    While the Debtors have largely maintained and even expanded their market share and roster of customers, the overall drilling and exploration activity in the geographic locations serviced by the Debtors has declined significantly, leading to a corresponding decline in customer orders and demand for the Debtors' services.

24.    The Debtors have taken numerous actions to mitigate the effects of the decline in activity levels, including but not limited to, headcount reductions of nearly 50 percent, identification and sale of redundant or excess fixed assets, such as rig mats and equipment, and consolidation of facilities.

25.    The dramatic change in the oil and gas market is reflected in the recent financial results for EPP.  In 2013, EPP generated $68.5 million in revenue and $20.6 million in unadjusted EBITDA.  Continuing to ride the growth in the markets, EPP increased revenue in 2014 by 70% to $116.4 million and generated $28.2 million in unadjusted EBITDA, an increase of 37%.  These were the audited numbers accounting for the two acquisitions completed in 2014

for only the periods during which they were owned by EPP.  Accounting for the two acquisitions completed in 2014 as if they had been owned for the full year and adding back one time charges to earnings, the numbers, which have not been audited, jump to $135.8 million in revenue and $38.5 million in normalized EBITDA.

26.     The decline in oil and gas prices that began in mid-2014, has impacted EPP significantly in 2015 as projected revenue has declined to $80 million, a decline of over 30% on a nominal basis but a drop of $55.8 million or 41% from the as if owned revenue of 2014. Earnings are affected even more dramatically, with the EBITDA adjusted for one time charges dropping to just under $8.7 million, a nominal decline of $18.2 million from 2014, and a drop of $28.5 million or 74% from the adjusted, as if owned earnings.  Revenue in the business has dropped across all categories even with liner installation holding up better than above ground tank and rig mat rental income, which accounts for the disproportionate drop in earnings because rental revenue has much higher margins than the labor intensive liner installation work.

## FIRST DAY PLEADINGS

27.     Concurrently with the filing of their chapter 11 cases, the Debtors will be filing a number of first day motions.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases (the "First Day Hearing"), at which time the Court will hear the First Day Motions.  For those motions being heard at the First Day Hearing, the relief requested therein is necessary and appropriate under the circumstances as the Debtors will suffer irreparable harm if any of the relief requested is not granted.

28.     Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtors' customers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient

administration of these cases.  I have reviewed each of the First Day Motions, including the

exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to

meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve

a successful reorganization.  I also believe that the matters addressed in the First Day Motions

are of a genuinely emergent nature, and that the relief requested in the First Day Motions is

required to preserve the assets of the Debtors' estates and to maintain the Debtors' ongoing

business operations.  Moreover, I believe, as further described below, that the failure to

immediately address the issues set forth in the First Day Motions will have extremely adverse

effects on the Debtors, their estates, and their creditors.

**A. Motion for Entry of an Order Authorizing Joint Administration of the Debtors' Related Chapter 11 Cases.**

29.    By this Motion, the Debtors request an order jointly administering the Debtors'

bankruptcy cases.  The Debtors anticipate that numerous notices, applications, motions, hearings,

and orders in these cases will affect both of the Debtors.  With two debtors before the Court,

each with its own case docket, the failure to administer these cases jointly would result in the

filing of duplicative pleadings for each issue that arises in these cases, and the service of each of

these duplicative pleadings on numerous overlapping service lists.  Joint administration of these

cases will eliminate these cumbersome filings and reduce the waste and burden on judicial

resources associated with the administration of these chapter 11 cases.  I also understand that

Joint administration will reduce the burden on the United States Trustee in supervising these

chapter 11 cases.

30.    Moreover, I understand that joint administration will not adversely affect

creditors' rights, as this Motion requests only administrative, and not substantive, consolidation

of the Debtors' cases.  Rather, the reduced costs resulting from joint administration of the

Debtors' estates will enhance the rights of all creditors.  Accordingly, I believe that an order authorizing the joint administration of the Debtors' case is in the best interests of the Debtors' estates and their creditors.

**B. Motion for Entry of Interim and Final Orders (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Service, (ii) Deeming Utility Providers Adequately Assured of Payment, and (iii) Establishing Procedures for Resolving Requests for Adequate Assurance of Payment**

31.     The Debtors seek entry of an Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) prohibiting the Utility Companies from discontinuing, altering or refusing service to the Debtors; (ii) deeming the Utility Companies to be adequately assured of payment on the basis of the Proposed Adequate Assurance; and (iii) establishing procedures for resolving requests for additional assurance of payment.

32.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' efforts reorganize.  The Debtors utilize the services of over 50 Utility Providers in the operation of their business.  If one or more of the Utility Companies refused to provide or discontinued services even for a brief period, the Debtors' operations could be severely disrupted.

33.     The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner.  As adequate assurance of the future performance, the Debtors propose to provide a deposit into a segregated account the amount of $18,000 within ten (10) business days of the first day hearing.  This amount is equal to the aggregate value of two weeks of service provided by the Debtors' Utility Providers.  The Debtors also propose a procedure by which Utilities Providers can request additional adequate assurance.

**C. Motion for Entry of an Order (I) Authorizing Payment of Wages and Employee Benefits; and (III) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

34.    In the ordinary course of their business, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of services. As of the Petition Date, the Debtors employed approximately 222 employees, all of whom are full-time employees, with some employees salaried and others paid on an hourly basis (collectively, the "Employees").

35.    The Debtors have costs and obligations with respect to the Employees relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date.

### THE DEBTORS' EMPLOYEE OBLIGATIONS

#### Wage Obligations

36.    Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, salary and compensation for the Employees (collectively, the "Wage Obligations") by check or through direct deposits into Employees' accounts on a weekly basis each Friday for the week ending the previous Sunday.  The Debtors' current weekly gross payroll (including tax and other withholding) has ranged from $265,000 to $320,000.

37.    On January 29, 2016, the Debtors paid their Employees for the week ending January 23, 2016.  Most of the Employees received payment by direct deposit but the Debtors believe that payments of approximately $7,000 were made by check, some of which may not have cleared prior to the Petition Date.  Following the Debtors' customary payroll schedule, the next payroll is due to be paid on February 5, 2016 for the week ending January 30, 2016.

38.      The Debtors seek authorization to pay any outstanding Wage Obligations due and owing for the week ending January 30, 2016 and for January 31, 2016 (which will be paid on February 12, 2016) in an amount up to $320,000, and to pay all Wage Obligations that arise post-petition in the ordinary course of business.  In addition, the Debtors seek permission to direct the Banks (as defined herein) to honor paychecks issued prior to the Petition Date.

**Performance Payments**

39.      The Debtors maintain, in the ordinary course of their business, a program (the "Incentive Program") that provides certain Employees responsible for sales with monetary incentives based on sales performance.  The Incentive Program is designed to provide market-competitive cash performance payments (collectively, the "Performance Payments") to Employees based on performance.  Performance Payments paid under the program are paid on a quarterly basis.

40.      The Incentive Program in effect for calendar year 2015 included the following components.  The Incentive Program includes three tiers to identify customers based on timing, volume and projection of sales for each account:

- First, for existing customer accounts, sales personnel are paid Performance Payments of one-quarter percent (0.25%) above 2014 revenue for accounts serviced by such personnel.

- Second, for dormant customer accounts, sales personnel are paid Performance Payments of one-half percent (0.5%) for new sales.

- Third, for new customer accounts, for the first year the new customer account is active, commission will be paid at three-quarters percent (0.75%). After one year, the account will be considered mature and an existing customer account.[2]

41.      The Debtors estimate that Employees had earned approximately $26,000.00 in Performance Payments through the Petition Date that have not yet been paid.  The Incentive

---

[2] Other conditions apply, and paid commission rates are subject to pricing and profitability per each sale.

Programs are important to encourage a high level of performance and maintain the Employees' morale. Thus, the Debtors seek to continue to honor and perform all obligations under the Incentive Programs in the ordinary course of business, including without limitation payment of the Performance Payments and payment of any prepetition claims on account of the Incentive Program.

### Reimbursable Expenses

42.     The Employees, the members of the Debtors' board of directors, and the Interim CFO incur various expenses (collectively, the "Reimbursable Expenses") in the discharge of their ordinary duties. Specifically, the Debtors reimburse Employees and the Interim CFO for a variety of business expenses, including without limitation, travel and meal expenses, use of personal vehicles used for business travel, and general expenses incurred for the Debtors' benefit. In addition, the members of the Debtors' board of directors are reimbursed expenses for attending the quarterly board meetings. Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees and directors are reimbursed in full after submission of appropriate documentations to the Debtors' accounting department. Expenses are reimbursed on a rolling basis.

43.     Reimbursable Expenses are paid by the Employees, officers and directors using cash or personal credit cards and the costs of these Reimbursable Expenses are reimbursed once it is determined that the charges are for legitimate reimbursable business expenses.[3] Although it is difficult for the Debtors to determine the amount of Reimbursable Expenses outstanding at any particular time, the Debtors estimate that no more than $10,000 in Reimbursable Expenses remain outstanding as of the Petition Date.

---

[3] Some expenses are paid using company credit cards; these expenses are not reimbursed (as they are not paid by Employees) and are not a subject of this Motion

44.     The Reimbursable Expenses were all incurred as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. Accordingly, to avoid financial harm to Employees who incurred Reimbursable Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, and (b) pay all Reimbursable Expenses due and owing (including those that accrued prepetition), or that may become due and owing, to Employees, the Interim CFO, and directors.

**Payroll Taxes**

45.     The Debtors are required by law to withhold from the Wage Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  The Debtors request the authority to pay these Payroll Taxes in the ordinary course of business.

46.     The Debtors remit most of the Payroll Taxes to the Taxing Authorities the business day after they are collected, but certain Payroll Taxes are due on a quarterly basis.  As of the Petition Date, the Debtors were current on their Payroll Taxes obligations due the business day after they are collected, but have a prepetition balance of approximately $30,000 owed for certain Payroll Taxes due on a monthly, quarterly, or annual basis to federal, state and local

Taxing Authorities.  The Debtors seek authority to pay these prepetition, outstanding Payroll Taxes in the ordinary course of business.

**Payroll Processing Fee**

47.     Payments to the Employees are handled on a centralized basis and with the assistance of a third party payroll processor, Paychex, Inc. ("Paychex"). A few days before each payday, the Debtors' payroll accounts is funded with enough money to cover payroll for the pay period. Paychex calculates the payroll obligations, handles direct deposits, prints the checks for Employees who elect to receive paychecks, sends the checks to the Debtor for distribution to Employees, and pays payroll taxes and other applicable deductions required by law. Paychex charges a nominal fee of approximately $1,650.00 per month for this service. The Debtors estimate that they owe Paychex approximately this amount for accrued prepetition amounts, and the Debtor seeks authorization to pay this nominal amount to Paychex.

**Employee Benefits**

48.     In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees, which can be divided into the following categories (collectively, the "Employee Benefits"): (1) medical, dental, life and accidental death and dismemberment insurance, disability, and accident and critical illness insurance (collectively, the "Health and Welfare Plans"); (2) paid time off plans, including vacation and sick days (collectively, the "PTO Plans"); and (3) the 401(k) plan (the "401(k) Plan").  The Debtors deduct specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as life insurance, disability insurance, medical insurance and 401(k) Plan contributions.

**Health and Welfare Plans**

49.     The Debtors offer a Basic Healthcare Package to all of their full-time Employees. The Basic Healthcare Package is administered by four different vendors: (i) Highmark Health ("Highmark") for group health; (ii) Key Benefit Administrators ("KBA") for group health; (iii) United Concordia ("United Concordia") for dental; and (iv) Mutual of Omaha for life ("Mutual of Omaha", and together with Highmark, KBA, and United Concordia, collectively, the "Benefits Insurers").

50.     Within the Basic Healthcare Package, the Debtors' medical coverage is provided through medical plans (the "Medical Plans") administered by Highmark (for the Debtors' year-round employees) and KBA (for the Debtors' seasonal Employees).  The Highmark Plan is fully funded and the KBA Plan is self-funded with an aggregate stop loss.  The Debtors pay Highmark and KBA on a monthly basis for coverage under the Medical Plans.  As of the Petition Date, the Debtors estimate that they owe Highmark approximately $60,000, and KBA approximately $15,000, in accrued and unpaid prepetition amounts on account of the Medical Plans, for January 2016.  Payments for subsequent months will become due each month after the Petition Date.

51.     United Concordia administers the Debtors' fully-insured dental plans ("Dental Plans").  The Debtors pay United Concordia on a monthly basis for coverage under the Dental Plans.   As of the Petition Date, the Debtors estimate that they owe United Concordia approximately $10,000, in accrued and unpaid prepetition amounts on account of the Dental Plans for January 2016.  Payments for subsequent months will become due each month after the Petition Date.

52.     The Debtors maintain basic life insurance for certain of their full-time Employees in addition to accidental death and dismemberment coverage ("Life Insurance Plans").  The Life Insurance Plans are administered by Mutual of Omaha (for full-time Employees) and

TransAmerica (for the Debtors' part-time Employees, with Employees contributing all premiums through payroll deductions).  The Debtors pay Mutual of Omaha on a monthly basis for coverage under the Life Insurance Plans, while payments to TransAmerica are deducted from Employee wages.   As of the Petition Date, the Debtors estimate that they owe Mutual of Omaha approximately $2,000, in accrued and unpaid prepetition amounts on account of the Life Insurance Plans, for January 2016.   Payments for subsequent months will become due each month after the Petition Date.

53.     The Debtors maintain long- and short-term disability, and accidental and critical illness insurance plans (the "<u>Disability Plans</u>").   The Disability Plans are provided by TransAmerica and administered by AmWINS Group.  All amounts for Disability Plans are paid through Employee contributions deducted from wages, and therefore, as of the Petition Date, the Debtors do not owe any amounts under the Disability Plans, but premiums will continue to be deducted and remitted from Employee wages.

**Paid Time Off Benefits**

54.     Under the PTO Plans, full-time Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation and other paid time off ("<u>PTO</u>").  The Employees earn their annual PTO days based on their status (*e.g.* salaried or non-salaried) and length of service.  Under the Debtors' current PTO Plan, Employees must use their paid time off during the year that it is earned and are not entitled to a cash payment for accrued PTO expect upon termination without cause.  The Debtors estimate that the total value of this PTO is currently approximately $240,000, must of which the Debtors expect will become payable as Employees take PTO in the ordinary course of business.  The Debtors seek approval to pay Employees for PTO in the ordinary course of business pursuant to their PTO Policy.

55.     The Debtors also administer other PTO programs for "personal days," holidays, military duty, jury duty, bereavement, and "standard comp time" (available to certain salaried Employees).  These programs allow Employees to take paid days away from work, but do not entitle the Employees to any payments for earned and unused PTO.

56.     The Debtors seek approval to pay Employees for PTO in the ordinary course of business pursuant to their PTO Policies.  The Debtors' are not at this time requesting authority to pay Employees for accrued PTO upon termination without cause.

### 401(k) Plan

57.     The Debtors coordinate and make available to Employees the 401(k) Plan, through which participating Employees can elect to withhold a portion of their wages (the "401(k) Contributions") to contribute toward a 401(k) plan.  Gold Leaf Partners (the "401(k) Manager") administers the 401(k) Plan.  On a monthly basis, the Debtors remit the 401(k) Contributions to the 401(k) Manager for application to the appropriate Employee's 401(k) Plan.

58.     The 401(k) Manager charges the Debtors approximately $1,500.00 per quarter to administer the 401(k) Plan.  As of the Petition Date, the Debtors owe the 401(k) Manager approximately $1,500.00 in unpaid fees.  Further, as of the Petition Date, the Debtors owed approximately $6,000.00 in 401(k) Contributions and 401(k) loan repayments to the 401(k) Manager for the Employees' benefit.  The Debtors seek permission to make contributions to the 401(k) Plan and pay the 401(k) Manager's fees in the ordinary course of business.

### The Necessity of the Relief Requested

59.     I believe that any delay or failure to pay the Employee Obligations would irreparably impair the Employees' morale, dedication, confidence, and cooperation.  Any such delay or failure would further adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to the Debtors' strategic vision for these chapter

11 cases.  At this stage, the Debtors simply cannot risk the substantial damage to the value of their business that would inevitably result if the payments described herein are not made to, or on behalf of, their Employees.

60.    In addition, absent an order granting the relief requested herein, the Employees will suffer hardship as the amounts in question are needed, for example, to fund the 401(k) Plan. Similarly, without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives.

61.    The Debtors do not seek to alter their Employees' compensation, vacation or other benefit policies through this Motion.  This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their sole discretion, to continue to honor certain of their practices, programs, and policies with respect to their Employees as they were in effect as of the Petition Date.

62.    Payment of the Employee Obligations is critical to these chapter 11 cases.  A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtors and the value of the Debtors' assets and businesses.  The total amount sought to be paid herein is relatively modest compared with the size of the Debtors' overall business and the importance of the Employees to the Debtors' chapter 11 cases. Accordingly, payment of all of the Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest.

**D. Motion for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance Coverage Policies and Practices; (II) Continuing Bond Coverage; and (III) Directing Banks to Honor All Payments Related Thereto**

<u>The Insurance Programs</u>

63.     In connection with the operation of their businesses, the Debtors currently maintain numerous insurance policies and programs providing coverage for, among other things, the following: Commercial Property, General Liability, Automobile Liability, Umbrella Liability, Leased/Rented Equipment, Equipment/Inland Marine, Workers' Compensation, Pollution, and Director and Officer Liability (collectively, the "<u>Insurance Programs</u>").  The Debtors' Insurance Programs are maintained with several different insurance carriers (the "<u>Insurance Carriers</u>") and include those Insurance Programs identified on <u>Exhibit A</u> attached hereto.[4]

64.     The annual premiums for the Debtors' current Insurance Programs total approximately $2,008,367.00.  The Insurance Programs are paid through a down payment of $443,281.00 with the remaining financed through premium financing programs (the "<u>Financing Programs</u>").  As of the Petition Date, the Debtors believe that they are current on all payment obligations currently due and owing with respect to the Insurance Programs.  The Debtors estimate that $1,579,318.00 will become due and owing with respect to the Insurance Programs after the Petition Date, with approximately $197,416 coming due each month beginning on February 6, 2016 (the "Installment Payments").

---

[4] In addition to the Insurance Programs listed in <u>Exhibit A</u>, the Debtors maintain numerous insurance policies with respect to employee health, dental, disability, and life insurance benefits.  These policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' wages and employee benefits programs.

**Bonds**

65.     In the ordinary course of business, the Debtors procure bonds (collectively, the "Bonds"), including without limitation, performance bonds and wage payment surety bonds, for the benefit of third-party beneficiaries.  Customers (and in some instances, state and local law) often require the Debtors to purchase the Bonds in connection with services performed by the Debtors on behalf of customers.  The Bonds are thus vital for the maintenance of the Debtors' businesses.  As of the Petition Date, the Debtors believe that they have paid all premiums due and owing on the Bonds.  The Debtors seek permission to renew the Bonds or, as necessary, procure new Bonds postpetition in the ordinary course of their business, and pay premiums related thereto.  As of the Petition Date, the Debtors have two Bonds in the total amount of approximately $996,515.00 outstanding, with total premiums for such Bonds being approximately $23,680.00.

**The Necessity of the Relief Requested**

67.     The Insurance Programs are essential to the preservation of the value of the Debtors' businesses, property, and assets.  In many cases, insurance coverage such as that provided by the Insurance Programs is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities.  Moreover, I understand that section 1112(b)(4)(C) of the Bankruptcy Code provides that a "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  Further, I understand that the Guidelines of the Office of the United States Trustee for the District of Delaware require debtors to maintain insurance coverage throughout their chapter 11 cases.

68.     The insurance coverage provided under the Insurance Programs is essential for preserving the Debtors' business, property, and assets, and, in many cases, such coverage is

required by various regulations, laws, and contracts that govern the Debtors' businesses.  If the Debtors did not continue to perform their obligations under the Insurance Programs, their coverage under the Insurance Programs could be voided.  Disruption of their insurance coverage, in turn, would expose the Debtors to serious risks, including, but not limited to: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed polices.  Any or all of these consequences would be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss at a minimum.  To avoid those consequences, the relief requested herein should be granted.

**E. Motion for Entry of an Order Authorizing the Debtors to Pay Prepetition Sales and Use Taxes in the Ordinary Course of Business**

69.    In the ordinary course of their business, the Debtors incur Sales taxes in connection with products sold and use taxes in connection with, among other things, items consumed at the Debtors' offices, and other facilities (collectively, "Sales and Use Taxes").  The Debtors request authority to pay Sales and Use Taxes in an amount not greater than $10,000 for the Monty of January 2016.

70.    Payment of the Sales and Use Taxes critical to the Debtors' continued, uninterrupted operations.  Nonpayment of the Sales and Use Taxes may cause taxing authorities to take precipitous action, including, but not limited to, filing liens, assessing interest and

penalties, preventing the Debtors from conducting business in the applicable jurisdictions, and seeking to the lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

71.    Additionally, nonpayment could result in certain states holding the Debtors' responsible officers personally liable in certain circumstances for unpaid sales and use taxes.  To the extent that the Sales and Use Taxes remain unpaid by the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases. The possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their effort to implement a successful reorganization strategy.   Accordingly, the Debtors believe that payment of the Sales and Uses Taxes is necessary for the Debtors' reorganization.

## F.  Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors

77.    The Debtors retain relationships with several Critical Vendors (defined below) that are essential to the maintenance of the Debtors' business.  I believe that, now that the Debtors are operating in chapter 11, the payment of claims of Critical Vendor Claims  is vital to the Debtors' continuing business operations.   In this regard, the Debtors used the following criteria to identify potential Critical Vendors whose Critical Vendor Claims are of such a nature that payment thereof is in the best interests of the Debtors and their estates:

- whether the Materials (as defined herein) may be purchased only from certain "sole source vendors";

- whether quality control or customer specifications prevent the Debtors from obtaining the Materials from reasonably available alternative sources;

- whether the Debtors receive advantageous pricing and other terms that they risk losing if they delay the payment of prepetition Claims (as defined herein) and as a result are forced to change vendors; or

- whether the Critical Vendors' business operations could be jeopardized if their prepetition Critical Vendor Claims are not timely paid.

78. The Debtors use a variety of products in their business operations, including environmental liner, foam, steel walls, organic filler, panels, and other materials as well as certain services (collectively, the "Materials") that are purchased from critical suppliers and service providers (the "Supply Vendors"). Such Materials are critical to Debtors' business because the Materials are critical and integral components of (i) the environmental lining sold and installed by the Debtors, (ii) the above-ground storage tanks and composite rig mats rented and installed by the Debtors, and (iii) the "closed loop" solids control services provided by the Debtors to customers. The number of critical Supply Vendors is small, but they supply a majority of the material used by the Debtors in their operations.

79. These Supply Vendors are critical because the Debtors' business is dependent upon a steady and immediate supply of Materials from vendors and other service providers. The "turnaround" and mobilization time on customer jobs for the Debtors is very short, and the Debtors typically are required to mobilize and provide services for customers on as little as 24 hours' notice or less. Therefore, it is critical to the Debtors' business that the Debtors have steady and uninterrupted access to Materials for use on customer jobs. The business relationships that the Debtors have developed with the Supply Vendors have enabled them to negotiate competitive rates and a level of certainty that the Materials will be delivered in a manner allowing for the Debtors to satisfy their customers' requests for fast turnaround and mobilization. If the Debtors' supply of Materials is interrupted or if the Debtors are forced to purchase Materials at higher costs, assuming they can be efficiently obtained in the necessary geographic locations, it will likely slow or even stop their operations and hinder their ability to meet customers' expectations and continue the Debtors' business.

78.     In addition, the Debtors utilize certain indispensable service providers who include providers of certain critical services ("Critical Services") including employee housing, transportation services, and maintenance services (the "Service Vendors," and together with the Supply Vendors, the "Critical Vendors").    The Service Vendors are indispensable and irreplaceable for the following reasons.    First, as to certain vendors who supply short-term workforce housing, such housing is critical to Debtors' business.    The Debtors are often required by customers to perform jobs in rural locations on short notice, requiring the Debtors to provide short-term workforce housing for employees in these locations.    In order to attract and retain the qualified and skilled workforce that is essential to Debtors' business, the Debtors must provide safe and comfortable accommodations to such employees in rural locations.    The Debtors have negotiated attractive rates and availability with the Service Vendors set forth herein to provide for housing in all of the customer locations serviced by the Debtors.    I believe that it will be difficult or impossible to replace such vendors with vendors offering comparable terms, and perhaps more significant, any disruption in existing accommodations may greatly disrupt ongoing, pending jobs, greatly harming the Debtors and their operations.

79.     Moreover, certain Service Vendors supply indispensable transportation and maintenance services.    These services are indispensable because these vendors have long working relationships with the Debtors and have superior knowledge of Debtors' operations, therefore allowing them to supply services much more efficiently than other potential alternative vendors.    (In addition, the amounts at issue in this motion for such vendors are relatively small, less than $20,000.)

80.     The Debtors have undertaken a thorough review of their accounts payable and ongoing operations to identify the Critical Vendors and the amount of Critical Vendor Claims.

As of the Petition date, the Debtors estimate that the Critical Vendor Claims aggregate approximately $2.1 million, which represents approximately 67% of the total amount of vendor claims against the Debtors.[5]

81.    By this Motion, the Debtors request authorization to pay in their sole discretion and to the extent determined by the Debtors to be necessary, in an aggregate amount not to exceed $1.3 million on the conditions set forth in the proposed order attached to the Motion as Exhibit A.

**The Necessity of the Relief Requested**

82.    I believe that maintaining the goods and services provided by the Critical Vendors is vital to the Debtors' continuing business operations and the success of these chapter 11 cases. In addition, the Debtors have conducted an extensive analysis and review of the Debtors' immediate trade needs and supplier base and have concluded there is a significant risk that the Critical Vendors will cease doing business with the Debtors unless their Critical Vendor Claims are paid.  Should any Critical Vendors stop supplying goods or services to the Debtors, or choose to significantly downgrade the Debtors' trade terms, the Debtors' businesses would be adversely affected.   This, in turn, could result in lost goodwill with their customers and customer dissatisfaction.  Accordingly, the Debtors submit that the amount of the Critical Vendor Claims pales in comparison to the likely damage to the Debtors' businesses and estates should the relief requested herein not be granted.  In light of the foregoing, I believe that payment of the Critical Vendor Claims is plainly in the best interests of their estates and creditors.

---

[5] Prior to the payment of any Claim, the Debtors will assess each Claim on a claim-by-claim basis and the Debtors are not seeking to pay the claims of all Critical Vendors in full.

**G. Motion for Entry of Interim and Final Orders: (i) Authorizing Continued Use of Cash Management System and Procedures; (ii) Authorizing Maintenance of Existing Bank Accounts; and (iii) Waiving the Requirement of § 11 U.S.C. 345(b)**

83.     The Debtors' existing bank accounts (as defined below, the "Bank Accounts") and cash management system and procedures ("Cash Management System") are structured to maximize efficiency within the Debtors' internal financial operations.  In the ordinary course of business, the Debtors use the Cash Management System to streamline collection, transfer, and disbursement of funds generated by the Debtors' business operations.

84.     Prior to the commencement of these chapter 11 cases, in the ordinary course of their businesses, the Debtors maintained seven separate bank accounts (the "Bank Accounts"), which are utilized to collect funds for their operations and to pay operating and administrative expenses in connection therewith. The Bank Accounts are all maintained with Citizens Bank of Pennsylvania ("Citizens Bank") (which is also the Agent for the Secured Lenders, as discussed in the Bouley Declaration), and are as follows:

| Account Number | Account Name | Purpose |
|---|---|---|
| ******4583 | Extreme Plastics Plus Inc. Operating | Demand deposit account for cash receipts & payables |
| ******0388 | Three Amigos Rentals Operating | Demand deposit account for cash receipts & payables |
| ******0876 | American Well Service LLC Operating | Demand deposit account for cash receipts & payables |
| ******4575 | Extreme Plastics Plus Inc. Payroll | Demand deposit account for payroll |
| ******0396 | Three Amigos Rentals Payroll | Demand deposit account for payroll |
| ******0884 | American Well Service LLC Payroll | Demand deposit account for payroll |
| ******2593 | EPP 401K Employee Deferral | Accumulating & paying employee 401K withholding |

85.     The Debtors utilize the three Bank Accounts described as "operating" accounts (account numbers ending in 4583, 0388, and 0876) to receive payments on accounts receivable

and pay trade and debt expenses of the operating Debtor, Extreme Plastics Plus, Inc.[6], with the exception of payments on the Secured Facility and certain other payments made by Extreme Plastics Plus, Inc. on behalf of both Debtors, as discussed below.  The Debtors utilize the three Bank Accounts labeled above as "payroll" accounts (account numbers ending in 4575, 0396, and 0884) for payment of payroll and tax withholdings.  Funds necessary for such payments are transferred for each pay period from the Debtor's "operating" account to the "payroll" accounts. The Debtors utilize the remaining Bank Account listed above (account number ending in 2593) for making payments to fund employee 401k contributions, which are funds transferred and withheld from payroll payments as directed by certain employees.

86.     The Debtors believe that all of the Bank Accounts are in a financially stable banking institution (Citizens Bank), with FDIC insurance (up to an applicable limit, if any, per Debtor).

87.     The cash management procedures utilized by the Debtors constitute ordinary, usual, and essential business practices and are similar to those used by other major corporate enterprises.  The cash management system facilitates cash forecasting and reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various bank accounts required to effect the collection, disbursement, and movement of cash.  The cash management system benefits the Debtors in significant ways, including the ability to: (i) control corporate funds; (ii) ensure availability of funds when necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

---

[6] As discussed in the Bouley Declaration, two subsidiaries of Debtor EPP Holdings, Inc. were merged into Debtor Extreme Plastics Plus, Inc. effective January 1, 2016.

88.     The operation of the Debtors' business requires that the cash management system continue during the pendency of these chapter 11 cases.  Requiring the Debtors to adopt a new, segmented cash management system at this early and critical stage of these cases would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive. Any such disruption could have an adverse impact upon the Debtors' ability to reorganize.

89.     I understand that the U.S. Trustee Guidelines for debtors in possession in order to supervise the administration of chapter 11 cases require chapter 11 debtors to, among other obligations: (a) close all existing bank accounts and open new debtor in possession bank accounts for which the signature cards shall indicate that the debtor is a "Chapter 11 Debtor-in-Possession"; (b) establish a new payroll account; and (c) maintain any funds in excess of the amount required for current operations in an interest-bearing account.

90.     The Debtors seek a waiver of the U.S. Trustee's requirement that the prepetition Bank Accounts be closed and that new post-petition bank accounts be opened.  I believe that this requirement would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to reorganize and pursue other alternatives to maximize the value of their estates. I believe that the Bank Accounts comprise an established cash management system that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course.  In order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to complete these cases successfully and rapidly, I believe that the Debtors must be permitted to continue to maintain their existing Bank Accounts and, if necessary, open new

and close existing accounts, wherever needed, whether or not such banks are designated depositories in the District of Delaware.

91.     The Debtors seek authority to keep the Bank Accounts open and to utilize them on an as-needed basis at the Debtors' discretion in the ordinary course of business.  The Debtors further request that the Banks be authorized and directed to continue to administer the Bank Accounts in the usual and ordinary course, and to pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Banks on account of a claim arising on or after the Petition Date so long as sufficient funds are in said Bank Accounts.

92.     The Debtors further request that Citizens Bank be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts and on account of a prepetition claim unless: (i) authorized in an order of this Court; (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtors; and (iii) supported by sufficient funds in the account in question.

93.     To effectuate the foregoing, the Debtors request that the Banks be authorized and directed to rely on all representations from the Debtors as to which checks should be honored or dishonored.  To the extent that the Debtors have directed that any prepetition checks be dishonored, they reserve the right to issue replacement checks to pay the amounts related to such dishonored checks consistent with the orders of this Court.

94.     In addition, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed to be debtor in possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.  Changing correspondence and business forms

would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  For these reasons, the Debtors request that they be authorized to use existing checks and business forms without being required to place the label "Debtor in Possession" on each.

95.    If the relief requested in this Motion is granted, the Debtors will not pay, and each of the banks at which the Bank Accounts are maintained will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

## H. Motion for Entry of an Order Authorizing Debtors to Continue Credit Card Program and Pay Certain Prepetition Claims of Credit Card Issuers

103.    The Debtors' business, in large part, a service business.  The service work is done by crews who go to job sites in company trucks and perform the work.  The services that the Debtors perform are time sensitive and must be done when the customer needs it done.  Some of these jobs are quick and can be done in one day and some span several days.  The Debtors currently have many jobs in process as well as several jobs they have committed to beginning in the next few days.  The Debtors' business model requires superior service to compete and if they cannot begin and finish jobs as required by their customers, the customers will likely move on to a competitor.

104.    In order to provide the necessary superior service, the Debtors' crews need to have ready access to available credit to purchase, among other things, fuel for the company vehicles, tools, supplies, meals and lodging.  In order to accomplish this, the Debtors have two company credit cards—a MasterCard with Citizens Bank (the "Citizens MasterCard") and a Universal Premium MasterCard (the "Universal MasterCard").  The Debtors employees use the Universal MasterCard primarily to purchase fuel and the Citizens MasterCard primarily to purchase tools, supplies, meals, and lodging and for other expenses.

105.    As of the Date, the Debtors owed approximately $16,000 on the Universal MasterCard.  This amount is scheduled to be paid by automatic debit on February 1, 2016 and may increase due to charges made over the past weekend.

106.    The Debtors' balance owed on the Citizens MasterCard for December 2015, in the amount of approximately $126,000, was paid by automatic debit on January 25, 2016.  The amount currently owed for the period ending as of January 31, 2016 is approximately $122,000 and may increase due to charges made over the past weekend.  The total amount due as of January 31, 2016 is scheduled to be paid by automatic debit on February 25, 2016.

107.    I believe that the maintenance of this credit card system is essential to the continued operation of their business.  If the issuers of these credit cards (the "Credit Card Issuers") refuse to extend credit to the Debtors after the Petition Date, the Debtors crews would not be able to purchase fuel for the company vehicles or pay other necessary expenses, which could result in an almost immediate shut down of the Debtors' business.  The Debtors' ability to pay the pre-petition claims of the Credit Card Issuers and continue the Credit Card Program following the Petition will allow the Debtors' crews to continue to purchase the fuel, tools and supplies and pay the other expenses necessary to keep the Debtors' business operating in the ordinary course of business following the Petition Date.

**I. Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Parties, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), and (D) Granting Related Relief**

108.    The Debtors request (a) pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, (i) authority to use cash collateral pursuant to section 363 of the Bankruptcy Code and (ii) authority to grant the Debtors' prepetition secured lenders adequate protection; and (b) the scheduling of a final hearing on the motion.

109.    The Debtors require immediate access to Cash Collateral to ensure that they are able to continue the operation of their business. To date, the Debtors have been unable to obtain commitments for postpetition financing, such that the Cash Collateral is the Debtors' sole source of funding for their operations and the costs of administering the chapter 11 process. Absent authority to immediately use Cash Collateral, the Debtors, their creditors and the estates generally would suffer irreparable harm because the Debtors would immediately cease operations, which, in turn, would cause an immediate and pronounced deterioration in the value of the Debtors' business. Thus, the Debtors' access to Cash Collateral is absolutely necessary to preserve and maximize value for the benefit of all of the Debtors' stakeholders.

110.    Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their business and thus preserve and maintain the going concern value of the Debtors' estates. Without such access to liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, to the detriment of the Secured Parties and all of the estate's other stakeholders. As a result, the Debtors have an immediate need to use Cash Collateral to ensure sufficient liquidity throughout the pendency of these Chapter 11 Cases.

111.    The Debtors intend to use such cash collateral to, among other things, fund their operations to enable the preservation of the business and reorganization under Chapter 11. Pursuant to the Interim Order, the interim cash collateral period requested is 30 days from the Petition Date.

112.    In conjunction with this request to use Cash Collateral, the Debtors have formulated the budget attached to the Cash Collateral Motion (the "Budget"). The Debtors believe that the Budget will provide the Debtors with adequate liquidity. The Interim Budget

contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared. I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Budget.

113.    The Budget demonstrates that the Debtors will remain at least cash flow neutral and, accordingly, the Secured Lenders interest in the Cash Collateral will not diminish in value during the thirteen weeks following the Petition. In addition, the Debtors will grant the Secured Lenders replacement liens in all of the collateral that the Secured Lenders had liens on as of the Petition Date. In addition, the Debtors will grant the Secured Lenders a first priority lien on all of the Debtors' unencumbered assets and allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code. Accordingly, I believe that the Secured Lenders' interested in the Cash Collateral will be adequately protected.

**J.    Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and 2002-1(f), Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date**

114.    The Debtors request the entry of an order, appointing Epiq as the Claims Agent to assume full responsibility for, among other things, the distribution of notices and maintenance, processing and docketing of proofs of claims filed in this chapter 11 case. The terms of Epiq's retention are set forth in the Services Agreement attached as Exhibit B to the Application (the "Services Agreement"). At this time, the Debtors' are seeking approval solely for the terms and provisions of the Services Agreement as set forth in this Application.[7]

---

[7] By separate application, the Debtors will seek authorization to retain and employ Epiq as administrative advisor in this chapter 11 pursuant to section 327(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") because the administration of this case will require Epiq to perform duties outside the scope of 28 U.S.C. § 156(c).

115.    I believe that the Debtors' selection of Epiq to act as the Claims Agent satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, instituted on February 1, 2012 (the "Claims Agent Protocol"), in that the Debtor has obtained, reviewed and competitively compared engagement proposals from three Court-approved claims and noticing agents, including Epiq, to ensure selection through a competitive process.   The Debtor submits, based on the engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

116.    Epiq is one of the country's leading chapter 11 administrators with vast experience in noticing and claims processing.  Epiq has a proprietary claims management system in which claims are effectively managed for the Office of the Clerk of the Bankruptcy Court (the "Clerk").   The Debtor has selected Epiq as the Claims Agent because of Epiq's abilities and experience serving in such capacity in chapter 11 cases of this size, as well as the reasonableness of its fees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on February 1, 2016

By: */s/ Ryan Boulsey*
Name: Ryan Bouley
Title: Chief Restructuring Officer

34